# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

## APPLICATION FOR A WRIT OF HABEAS CORPUS
### PURSUANT TO 28 U.S.C. § 2241
### BY A PERSON IN FEDERAL CUSTODY

DEC 0 8 2008

United States District Court
District of Connecticut
FILED AT     BRIDGEPORT

12/8                    20__

Roberta D. Tabora, Clerk

By_____
           Deputy Clerk

Sharon Lee Caulder 28836-034 Petitioner,
   Full Name and Prisoner Number

Danbury Federal Prison Camp
   Complete Prison Address (Place of Confinement)

331/2 Pembroke Station Rd

Danbury, CT 06811

Case No. 3:08CU1903(VLB)
   (To be supplied
   by the Court)

   v.

Donna Zickefoose, Warden Respondent,
   (Name of Warden, Superintendent or
   authorized person having custody of petitioner)
   (Do not use *et al.*)

      and

Harley G. Lappin __, Additional Respondent.
   (List additional persons having custody
   of petitioner, if any)

## CONVICTION UNDER ATTACK

1) Name and location of the court which entered the judgment of conviction under attack __US District Court - Northern Distr of CA__

2) Date judgment of conviction was entered __May 25, 2007__

3) Case number __CR 04-40016 CW__

4) Type and length of sentence imposed __30 months- Bankruptcy__
__Fraud & Tax Misdemeanor__

5) Are you presently serving a sentence imposed for a conviction other than the conviction under attack in this motion?   Yes ___   No __x__

6) Nature of the offense involved (all counts) __18 USC §152 (1)-Conceal__ ment of Assets in Bankruptcy - 4 cts; §7203 - Willful failure to file __tax return (misdemeanor) 6 cts__

7) What was your plea? (check one)
Not Guilty __X__   Guilty ___   Nolo Contendere ___

8) If you entered a guilty plea to one count or indictment, and a not guilty plea to another court or indictment, give details:

9) If you entered a plea of guilty pursuant to a plea bargain, state the terms and conditions of the agreement _____

10) Kind of trial (check one)   Jury __X__   Judge only ___

11) Did you testify at trial?  Yes ___   No __x__

### DIRECT APPEAL

12) Did you appeal from the judgment of conviction?     Yes __x__  No ___

13) If you did appeal, give the name and location of the court where the appeal was filed, the result, the case number and date of the court's decision (or attach a copy of

the court's opinion or order): __Northern California Court of Appeals__
Ninth Circuit - Nov 19, 2008. Lost the appeal
_CASe # 06 -10355_

14) If you did not appeal, explain briefly why you did not: _____

a) Did you seek permission to file a late appeal? Yes __ No __

## POST-CONVICTION PROCEEDINGS

15) Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any federal court?    Yesx__ No __

16) If your answer to 15 was "Yes," give the following information:

  a) FIRST petition, application or motion.

    1. Name of court __Northern District of CA Appellate__
          Court

    2. Nature of proceeding §2255

    3. Claims raised __See attached document summarizing__ §2255.

    4. Did you receive an evidentiary hearing on your petition, application or motion? Yes __ Nox__

    5. Result Pending

    6. Date of result Filed May 4, 2008.

    7. Did you appeal the result to the federal appellate court having

jurisdiction? Yes __ No __   If you did appeal, give the name of the court where the appeal was filed, the result, the case number, citation and date of the court's decision (or attach a copy of the court's opinion or order)

_____

_____

8.    If you did not appeal, briefly explain why you did not  _____

_____

_____

b) As to any SECOND petition, application or motion, give the following information:

1.    Name of court _____

2.    Nature of proceeding _____

_____

3.    Claims raised _____

_____

4.    Did you receive an evidentiary hearing on your petition, application or motion?  Yes __ No __

5.    Result _____

6.    Date of result _____

7.    Did you appeal the result to the federal appellate court having jurisdiction? Yes __ No __   If you did appeal, give the name of the court where the appeal was filed, the result, the case number, citation and date of the court's decision (or attach a copy of the court's opinion or order) ____

_____

_____

_____

8.    If you did not appeal, briefly explain why you did not _____

## CLAIMS

17) State concisely every claim that you are being held unlawfully. Summarize briefly the facts supporting each claim. If necessary, you may attach extra pages stating additional claims and supporting facts. You should raise in this petition all claims for relief which relate to the conviction under attack.

In order to proceed in federal court, you ordinarily must exhaust the administrative remedies available to you as to each claim on which you request action by the federal court.

PLEASE SEE ATTACHED Document

**Claim One**: _____

_____

_____

(1) Supporting Facts: (Without citing legal authorities or argument state briefly the facts supporting this claim)

(2) Did you seek administrative relief as to claim one? Yes ___ No ___. If your answer is "Yes," describe the procedure followed and the result. If your answer is "No," explain why you did not seek administrative relief: _____

_____

_____

_____

**Claim Two**: _____

_____

(1)  Supporting Facts:  (Without citing legal authorities or argument state briefly the facts in support of this claim)

(2)  Did you seek administrative relief as to claim one?  Yes __ No __.  If your answer is "Yes," describe the procedure followed and the result.  If your answer is "No," explain why you did not seek administrative relief: _____

_____

_____

_____

**Claim Three**: _____

_____

_____

(1)  Supporting Facts:  (Without citing legal authorities or argument state briefly the facts in support of this claim)

(2) Did you seek administrative relief as to claim one? Yes X  No __.  If your answer is "Yes," describe the procedure followed and the result.  If your answer is "No," explain why you did not seek administrative relief: __The Camp__ administrators replied on my informal remedy form that such a transfer is NOT within their jurisdiction. It is the realm of the court. Therefore it was senseless to continue to pursue the administrative remedy route. I have, however conitinued with the administrative rededy procedures to request 12 month CCC per the Second Chance Act of 2007. This is still in process.

18)   Do you have any petition, application, motion or appeal now pending in any court, either state or federal, regarding the conviction under attack? Yes __  No  X .  If "Yes," state the name of the court, case file number (if known), and the nature of the proceeding:____

19)   State briefly why you believe that the remedy provided by 28 U.S.C. § 2255 (Motion to Vacate Sentence) is inadequate or ineffective to test the legality of your detention: _____

Because the §2255 is used for a Fed. Prisoner's challenge to the execution of a sentence, §2241 in contrast, is used to challenge the imposition of a sentence. (28 USCA §2241)

Wherefore, petitioner prays that the court grant him such relief to which he may be entitled in this proceeding.

___pro se___
Signature of Attorney (if any)

_Petitioner's Original Signature_

#28836-034
Petitioner's Inmate Number

Danbury Fed Camp Station Rd
33 1/3 Pembroke Station Rd
Danbury CT 00811

_____
_____
_____
Attorney's Full Address and
Telephone Number

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he/she is the petitioner in this action, that he/she has read this petition and that the information contained in the petition is true and correct.  28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed at __Danbury Camp__ on __Dec 1 '08__
                (Location)              (Date)

_Petitioner's Original Signature_

SHARON LEE CAULDER
V
DONNA ZICKEFOOSE, WARDEN
Danbury Federal Prison Camp

Now comes Sharon Lee Caulder, pro se, compelling the Bureau of Prisons to immediately consider transfer to Residential Reentry Center (RRC). Defendant is presently incarcerated at Danbury Federal Prison Camp since January 11, 2008, until February 11, 2010, thus far with clear conduct. Defendant teaches science and social studies to GED students and assists inmates with their legal documents in the law library.

Defendant continues to plead not guilty to charges of Bank-ruptcy Fraud and Tax Misdemeanor, having lost her direct appeal, in November 2008. Defendant is well educated and has left a very positive legacy upon society and plans to continue to do so, during and following her incarceration.

Wherefore on May 4, 2008, defendant submitted a §2255 to vacate her sentence. Whereby the motion containing 20 grounds of violation of her constitutional rights, the primary right being religious animus, was accepted and filed. It is pending. (see attached summary of the grounds under collateral attack).

Wherefore support for implementing 28 §2241 for this issue challenging the execution of a sentence can be duly noted in: (Chambers v US 106 F.3d 472 2nd Cir 1997; Lowry v Apker 2006 SDNY Feb 9, 2006; Pimental v Gonzales 367 F. Supp 2nd 365 EdNY 2005; Frances v BOP WL82 1703 SDNY April 8, 2005).

## Exhaustion of Administrative Remedies:

Exhaustion of administrative remedies are not required in the presence of: (1) available remedies provide no "genuine opportunity for adequate relief;" (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be "futile;" and (4) in certain instances a plain-tiff has raised a "substantial constitutional question." (Von Hoffburg 615 F.2d at 638; Guitard v US Sec'y of Navy 967 F.2d 737 2nd Cir 1992).

## Rationale for Determining Administrative Remedies Are Inadequate:

Attached informal remedy documents signed by the Camp Administrator, Ms Chapa and Case manager, Mrs. Wattree, are

adamant that defendant's request for immediate transfer to RRC cannot be granted by BOP because it would exceed the agency's jurisdiction. Thereby making it inefficacious to continue remedies.

Defendant has availed herself of all possible remedies within the BOP. Application for transfer was arrested at the initial informal remedy stage with the denial of a document referred to as a "cop-out," by the Camp administrative team, Ms Chapa and Mrs Wattree.

My experiences assisting prisoners with legal issues were that exceptionally few prisoners have been granted even 6 months halfway house residency (an aspect of RRC) as per 18 §3624 since 2002 and no one has been granted up to 12 months or above for medical reasons per the Second Chance Act of 2007, passed April 9, 2008.

During recent verbal interaction with Warden Zickefoose, at the Camp, concerning the halfway house transfers and compliance with the new Act, she informed me that the lawmakers failed to consider her opinion when creating the Act. In her opinion 6 months and above RRC works against the prisoner, therefore she does not, nor does she intend to, grant the mandated amount of RRC. Warden Zickefoose explained that her decision is based on a statistic reporting 80 per cent recidivism of prisoners granted 6 months and more RRC. Defendant's interjection that perhaps that statistic referred to "hardcore" convicts and not the majority first offenders, non-violent, females that populate the Danbury Camp, was ignored, as was defendant's reminder that laws are created based on the strident, considerable research by the Department of Justice.

Whereby it appears that Warden Zickefoose has created and abides by her own laws, rather than those mandated by the judiciary.

According to the Second Chance Act the BOP was directed to have its procedures and regulations instituted by July 9, 2008, and prepare a report specifying how the Act has been implemented by January of 2009. As of November end, no procedures or regulations have been forthcoming. A report in January should specify "0" prisoners granted the Act.

Whereby, it is obvious that the defendant will be unsuccessful in vindicating her rights in the administrative remedy

process, such that it is. Attached are factual records of admin-
istrative decisions concerning defendant's request.

Whereby defendant asserts that her due process rights
pursuant to the 6th Amendment have been violated as according to
statutes 18 §3621(b) and 3624(c), the law has been violated by
the BOP, impeding her right to transfer immediately to a RRC.

Wherefore in consideration of a viable possibility that the
BOP will make my case an exception, defendant has in process
an administrative appeal requesting 12 months halfway house re-
sidency (RRC) based on the criteria delineated in the Act itself
all of which the defendant meets the qualifications.

Considering the similarities of her two requests, an ex-
cellent presumption can be made, based on the responses to both
appeals: (1) request for 12 month RRC based on the Second Chance
Act of 2007  and (2) request for immediate transfer to RRC, based
on laws and their interpretations through legal cases. Both re-
quests have been denied during Team Meetings presided over by
Ms Chapa and Mrs Wattree and Mrs Perkins in attendance, with
scorn and ridicule inplace of the respect afforded prisoners,
by the staff, as mandated by the BOP, in the Prisoners' Rights
Document. It is most likely that I will be administered punish-
ment for the submission of this very document.

Respecting that the BOP should be the primary authority for
the interpretation of their regulations, the issue arises when
they demonstrate absolute distain for the legal statutes and
are at liberty to totally ignore them in this democratic society.
The Second Chance Act is an excellent example. As a legal re-
search assistant, I have witnessed rejection of all requests,
which constitutes many, for over 6 months RRC.

Following a reading of the Department of Justice research
from which the Second Chance Act was promulgated, as a prisoner I
claim my right to take advantage of the accumulated data that is
the foundation of the Act and be granted the advantages deemed
necessary, according to research, to impede my recidivism.
Failure to allow such action or one similar, like immediate
transfer to RRC, violates my right to due process pursuant to
the 6th Amendment.

Caulder 4

Wherefore as disclosed in 18 USCA §3621(b) and §3624(c), the court grants the BOP the ability to place an inmate in any suitable prison facility at any time without limitation of the last 10 percent of their sentence. Court contemporaneously authorizes the BOP to "place a prisoner where it wishes so long as it considers the factors enumerated..." Statute 18  3624(c) mandates the BOP to prepare prisoners for reentry into the community. Whereby the 2nd Circuit is in accord with the statutes as interpreted thus. (Woodall 432 F.3d at 245; Faults F.3d at 1092).

In transferring an inmate to a Community Corrections Center (CCC) or any "available penal or correctional facility" the BOP must consider the factors set forth in §3621(b), without reference to 28 CFR §570.21.

Levine (Levine v Apker 455 F.3d 71 2nd Cir 2006) argues that in addition to violating the agency's statutory authority, the BOP regulations violates the ex post facto doctrine. (U.S. Const. art I, §9["no Bill of Attainder or ex post factor law shall be passed"]. (Torres v Walker 356 F.3d 238 2nd Cir 2004; US v Leon 766 F.2d 77 2nd Cir 1985).

(Goldings v Winn 383 F3d 17 1st Cir 2004) – **Holdings:**
(1) Sentencing Reform Act's conferral upon BOP of discretionary authority to designate place of imprisonment applies to prison-er transfers as well as initial designation; 18 USCA §3621(b).
(2) Act's pre-release custody provision does not prohibit BOP from considering community confinement or other pre-release alternatives prior to end of prisoner's prison term, 18 §3624(c);
(3) Community Corrections facility qualifies as "penal or corr-ectional facility" and in turn qualifies as "place of imprison-ment" under Act.

Under Sentencing Reform Act, it is not place of imprisonment that determines whether offender is imprisoned, but fact and nature of offender's sentence, and identify of custodian, ie Bureau of Prisons (BOP). 18 USCA § 3621 (a-b).

There is no language in §3621(b) that limits the BOP's designation authority to the prisoner's initial place of im-prisonment. It expressly provides that "BOP at <u>any time</u>... can direct the transfer of a prisoner from one penal or correctional facility to another." Thus on its face, §3621(b) permits the

Caulder 5

BOP to direct defendant's transfer to a CCC prior to last 10 percent of her prison term unless, as the defendant's argue §3621(1) does not apply to CCC placements at all because a CCC is not a "place of imprisonment."

If a CCC maybe a place of imprisonment during the last 10 percent of a prisoner's term of imprisonment, it would be in-congruous to conclude that the same CCC may not be a place of imprisonment during any portion of the first 90 percent of that term.

We hold that 18 USC §3621(b) authorizes the BOP to transfer inmates to a CCC at anytime during her prison term. The BOP's discretionary authority under §3621(b) is not subject to the temporal limitations of 18 USC §3624(c). 18 USC §3624 - Release of a prisoner: The authority provided by this subsection may be used to place a prisoner in home confinement.

You cannot use the limiting language of §3624(c) to rewrite the unambiguous language of §3621(b) so that "at any time," but rather "only for the lesser of the last 6 months or 10 percent of a prisoner's term of imprisonment." The significance of this rewriting cannot be ignored. The relationship between §3621(b) and §3624(c) is as follows: CCC is a penal or correctional facility, therefore the BOP has statutory authority to transfer a petitioner to a CCC at any time during her term of imprison-ment.

**Other important issues:**

It should also be noted that administrative remedies take anywhere from 6-12 months to complete. Staff is aware that certain documents are deliberately delayed at the expense of the prisoner's issue. Several inmates can attest to the fact that the BOP regularly delays and /or discards mail addressed to regional offfices and the Connecticut court. This can be sub-stantiated by tracking US postal certification numbers. Court mail has been presented to the prisoner 2-4 months later, to disrupt the legal time limitations. It appears to be mail fraud, committed against the inmates.

I would be very disappointed to discover that manipulating mail by any agency or bureau is legal.

Caulder 6

## 18 USC § 3621 Imprisonment of a convicted person, Subsection (b).

(b) Place of imprisonment. The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The BOP may designate any available penal or correctional facility that meets minimum standards of health and habitibility established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district which the person was convicted, that the Bureau determines to be appropriate and suitable, considering:

**(1) the resources of the facility contemplated;**

As previously recognized by the Department of Justice in compiling statistics and information with which to create new statutes and policies to assist the prisoners, particularly in preparation for reentry into the communities throughout the country, the resources within the prisons, including camps are too  limited, to assist in the reentry phase. Halfway houses and ones own home, will make available to the prisoner all encoutrements vital to locating and maintaining a job. Unencumbered telephone, email, daily newspaper, and internet services are required. Community job placement services for special situations are a must.

In this fragile economy much time and dedication are necessary to find a job. Even with the incentives that the government offers employers to hire felons, few businesses take advantage of the opportunity. There are no vocational programs available in the Camp, for those in need.

My personal experience, while awaiting my appeal, even with a medical speciality, physical therapy, during a time of war, over 35 years of experience and several advanced degrees, including a PhD, I was denied a licence by state governments with statutes on the book, makin discrimination against a felon illegal, in occupational licencing and hiring, and the Federal

Caulder 7

laws protecting felons did not assist me. When I was allowed to receive a licence by one state, every time my fingerprints were taken, one government department or another would dismiss me, like the Health Department, for example. It did not matter how much my managers fought to retain me. When I finally got the EEOC to take my case, they gave me permission to sue the state government. Most felons are not wealthy, therefore cannot afford an attorney.

At 64 years old, my best chance would be to find a job as soon as possible, because again regardless of the laws against age discrimination, it is a challenge to maneuver.

Having survived Hurricane Katrina two months prior to my trial, I need to find a place to live as well as a job. I lost my home and business in Katrina, and as most people know Fema did not help most of us. I would like to live independently, and not interfere with the lives of my children.

The financial arrangement afforded by a halfway house will enable me to utilize community resources, acclimate to a new community, and begin anew. I also need to finance an automobile.

Surviving the Hurricane triggered my PTSD symptoms, and the time spent in prison with no psychological assistance to counter the harsh living situation, just added to my psychological issues, as has been determined to do, by the mental health professionals. I would be able to access community health services, as well as adequate physical health services, so inadequate in the prison environment.

With a true understanding of the problems that plague a felon, in the free world, it is no wonder that so few can survive and prosper, and thus return to prison for survival.

Caulder 8

It is quite obvious that I need the resources of an RRC.

**(2) the nature and circumstances of the offense;**

I was found guilty of Bankruptcy Fraud and Tax Misdemeanor,
as a first time offender, non-violent crime.

**(3) the history and characteristics of the prisoner;**

I have resided in this world as an upstanding, well edu-
cated individual, have been able to continue in this manner
while incarcerated, and will continue to do so in the free
world.

While incarcerated, I teach science and social studies in
the GED school program and in my leisure time assist inmates
with their legal work. My conduct has been clear in prison.

This is my first offense and I will claim my innocence to
my death. I plan to continue appeals as long as I need to or am
able to.

**(4) any statement by the court that imposed the sentence; (A)
concerning the purposes for which the sentence to imprisonment
was determined to be warranted; or (B) recommending a type of
penal or correctional facility as appropriate;**

The trial judge recommended a camp close to New Jersey,
because I have family there.

**(5) any pertinent policy statement issued by the Sentencing
Commission pursuant to section 994(a)(2) of title 28;**

None.

In conclusion the BOP's regulations conflict with the
plain language of 18 USC § 3621 (b) as to when an inmate may be
considered for initial placement in or transfer to an RRC.
Defendant requests an order directing the BOP to immediately
consider transferring her to spend the remainder of her sentence

Caulder 9

in a halfway house or home confinement. Thereby she can restart
her life and mend family relationships as they have suffered
more so than she has during this challenging experience. This
situation has been particularly harsh on her teenage grandsons
who as a result have developed both a fear and a disappointment
in the law. As with (Rodriguez v Smith 541 F.3d 1180 9th Cir 2008)
defendant requests the BOP to promptly consider her for transfer
to an RRC without reference to 28 CFR §§ 570.20 and 570.21.


Respectfully submitted,

*Sharon Caulder*

Sharon Lee Caulder
#28836-034

Danbury Federal Prison Camp
331/2 Pembroke Station Rd
Danbury, CT 06811

<u>OVERVIEW OF MOTION §2255</u>

<u>SUBMITTED MAY 4, 2008.</u>

<u>Motion Pending</u>

UNITED STATES COURT OF APPEALS
NINTH DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | No. 08-10339 |
| SHARON LEE CAULDER, | D.C. No. 4:04-cr-40016-CW |
| Defendant - Appellant | Northern District of California Oakland |

ADDENDUM to REPLY to Order to Show Cause Why Appeal Court has Jurisdiction to Recuse District Judge

August 16, 2008

Now comes Appellant Sharon Lee Caulder, Pro Se, with an addendum to her original reply of August 11, 2008, concerning her §2255.

According to Federal Rule 4(a), there is the right to Appellate Review if the trial judge refuses to grant her motion. Trial Judge Claudia Wilken refused to recuse herself after Appellant filed an Affidavid of Bias, requesting judge to recuse herself from adjudication of her §2255 motion.

Recusal statute, 28USCS §455(a) and (b), requires mandatory disqualification of judge in any proceeding in which her impartiality might reasonably be questioned or where she has personal bias or prejudice concerning party. US Brown (1976, CA 5 LA) 539 F.2d 467.

As stated in 28USC§455(1), Appellate Court's authority to reassign case to different judge on remand exists apart from judicial disqualification statutes and absent proof of personal bias, remand to new judge will be made only under extreme circumstances. O'Rourke v Norman (1989, CA10 Okla)875 F.2d 1465, cert denied (1989).

Ordinarily 28USC§144 and §455 are invoked at the district Court level to effectuate recusal. However, these statutory provisions are not the exclusive route for disqualification. The Appellate Court's authority to reassign exists apart from the judicial disqualification statutes.

Trial Judge Claudia Wilken appealed to the prejudices of the jury, specifically to the prejudice against a religion that has erroneously sustained a malevolent reputation among Westerners for years (Vodun). Religious animus is intricately woven throughout the fabric of these judicial bankruptcy and tax proceeding.

It was out of pure desperation and animosity that a bankruptcy and tax case was so expertly crafted by the government sacrificing defendant and perpetuating sacrilege against her religion. Much of the hypocrisy was enacted through the government's star witness, Michael De la Cruz.

Religious based comments peppered the legal proceedings and obviously influenced the Judge's ruling on the amount of time to sentence the defendant to prison. <u>Darden v Wainwright 477 US 168.</u>

Sharon Caulder was the focus of a governmental witch hunt initiated in 2003. She was A Chief in her ancestral religion African Vodun (Voodoo) and a spiritual practitioner, with a spiritual-energy medicine practice in Northern California. As she was conducting a successful and honest business, the FBI in their relentless pursuit of spiritual practitioners, trumped up false charges of bankruptcy fraud and tax misdemeanor, to annihilate their prey.

Defendant charges the government with religious discrimination. The religious discrimination is cloaked in charges of bankruptcy fraud for which there is no motive, and tax misdeameanor.

The strategy of these proceedings was to impeach the credibility of the defendant through her religious beliefs. Testimonial evidence referring to defendant's vilified religion (Voodoo) was used to de-humanize the defendant, as enslavers used propaganda and rhetoric to de-humanize their captives, which served to condone their crucifixion and torture of them, as was the defendant.

The unequivocal purpose of government star witness De la Cruz's testimony was to discredit the petitioner through descriptive allegations of her malevolent behavior, scripted

from a poor Voodoo film, mental torture, poisoned food and water as she stirred the cauldron over an explosive fire hundreds of miles away. The only missing prop was the infamous voodoo doll. [ER 523-607]

De la Cruz was interviewed and coached repeatedly for trial by the government. They knew precisely the content of De la Cruz testimony.Using questions as triggers, the government planned to use De la Cruz's testimony to vilify and impeach the defendant.

The other ex-clients were strategically used to camouflage De la Cruz's actual purpose as a witness. De la Cruz was the only ex-client the government could locate who was dissastified with their treatment and wished to testify about it, under the pretense to testify about payments to defendant, directed by Judge Wilken in a Motion of Limine.

Federal Rule 4 (a) recognizes that under certain circumstances, a judge may want to disqualify herself. A movant is not without remedy if she perceives the performance of the Judge to be unfair to her. She can file an affidavit of bias. And there is the right to Appellate review, if the trial judge refuses to grant her motion.

Disqualification of justice, judge, or magistrate §455, was designed to "promote public confidence in the impartiality of the judicial process. Identifying reasonable factual bases for doubting the judge's impartiality, the judge is obligated to remove herself. Ouachita Nat Bank v Tosco Corp 686 F.2d 1291 1982. Blizard v Fielding 454 F. Supp 318 D. Mass. quoting H.R. Rep No. 1453, 93rd Congress 2nd sess. 1978.

Litigants ought not have to face a judge where there is a reasonable question of impartiality. If the judge has repeatedly displayed bias by their recorded judicial conduct during pre and trial proceedings, then the Court of Appeals should respectfully recuse the judge from adjudicating a Motion to Vacate, set aside or correct a sentence via §2255, filed in that same case. US v Martorano 620 F.2d 912 1980.

According to Martorano, Id 912, the standard by which such a motion is judged is, "whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of

-4-

the judge herself or even necessarily in the mind of the litigant
filing the motion under 28 USC §455, but rather in the mind
of the reasonable man."

It can be that it is advantageous to have the original
judge continue on a case because of familiarity with earlier
proceedings. But reserve must be instituted when personal
religious animus is so excessive and obvious during the trial.
Upon receipt of movant's Motion of Bias, requesting her recusal
from ruling on her §2255 motion, Judge Wilkens's reply reiterated
movant's accusations of her religious animus, and then refused
to recuse herself. There was no denial of the accusations!

This document is intended to prove without a doubt that
Judge Wilken demonstrated personal bias in the form of religious
animus towards defendant through her legal proceedings, from
beginning to end.

Having abused her judicial discretion, she should refrain
from adjudicating defendant's motion §2255. If Judge Wilken
was not impartial during trial, it can be assumed that violation
of her discretionary behavior would continue.

Within her §2255, Appellant charges Judge Wilken with
violation of her 1st Amendment right to freedom of religion
and her 5th Amendment right to a fair trial. The religious and
personal animus suffered by the Appellant are extreme.
Extreme circumstances include:

Plain Error - Violation of Motion of Limine ruling in regards
to (1) order to exclude reference to government persecution
of the defendant based on her race and religion, spiritual,
and philosophical beliefs; (2) based on relevance and privilege
the Court limit cross-examination of witnesses Michael De la
Cruz, etc., whereas, De la Cruz was government's star witness
and was the focus of hours of testimony around the Appellant
being an archetypal Voodoo priestess, hypnotizing, crippling,
and poisoning him from hundreds of miles away; all during a
Bankruptcy and tax case. [Criminal Docket 4/25/05 #36 & ER
523-607].

Refusal of Bail: Based on Appellant's religion, as she met all
customary requirements for freedom on bail, even in light of
the FBI Agents promise of routine bail and New Orleans' judge
stating in open Court that refusing bail by Judge Wilken was

contacted her.

Religious Animus and Personal Bias Statements by Judge Wilken
"We aren't going into you had six demons, and this person had
five demons or whatever and..." said Judge Wilken [ER 54/21].

As stated in transcript [ER 2, 8/15/05], during pre-trial
hearing, Judge Wilken made a statement referring to the Govern-
ment's star witness, "You know I was uncomfortable signing
these subpoenas without some input from this victim who obviously
has some rights in the matter..." Judge Wilken was erroneously
and prejudicially referring to De la Cruz as defendant's victim
of fraud [ER 14]. This statement: (1) regards the defendant
as a perpetrator (bias); and (2) and does not refer to the
Bankruptcy and Tax issues of the proceedings.

Religious and personal animus are evident here. There is
attitude of extrajudicial origin. 28 USCA §455, US v Zagari
419 F Supp. 494, 501.

[ER 14] Judge Wilken, "and what the fraud was..." Here
again, the judge was referring to medical fraud against the
star witness. Trial counsel had to repeatedly remind the judge
that this was a Bankruptcy and Tax case, not a medical fraud
case. Obviously, in the eyes of Judge Wilken Appellant was
guilty on two counts prior to the jury's decision - being a
Voodoo Priestess and a perpetrator of medical fraud. This was
evident to the jury and all official parties in the proceedings.
Trial counsel went along with the ruse. And all was recorded!

[ER 527] Cross examination of De la Cruz by trial Counsel
Blank was as such, "Q. And you claim to be a victim of medical
fraud?" A."Yes, sir.

[ER 545] During hours of demonizing, irrelevant testimony
Judge Wilken at one point stated, "I don't think it goes to
bias or any relevant matters in this case (referring to
testimony." Then at least an hour later as the testimony
continues to escalate, Judge Wilkens admits,"its just not what
we are here for." This type of testimony still continued for
hours into the redirect of De la Cruz.

The impartiality of Judge Wilken is reasonably questioned

when the main witness in a bankruptcy fraud and Tax case
testifies to having been psychologically tortured;
receiving suicidal tendency manipulation and the theory of
consciousness evolution.

Federal Rule of Evidence 610, prohibits religion to impeach
a witness's credibility. Evidence of the beliefs or opinion
of a witness on matters of religion is not admissible for the
purpose of showing that by reason of their nature the witness'
credibility is impaired or enhanced.

This rule can be modified to extend to protect the defendant
as a witness for her own defense. It's interpretation can also
be projected to protect the defendant from the government using
a witness to proffer religious discrimination to impeach and
vilify a defendant's character.

Defendant's professional practice was a synthesis of her
educational studies of Physical Therapy, Psychology, Mythology
and Metaphysics. Her practice was not one of traditional Vodun
religion. (Chief Sharon Caulder, PhD, PT, EdM, MS, MA, Psy.
certification.) Appellant separated her religion from her pro-
fession as do most professionals.Therefore her religion should
never have been part of the trial.

Cumulative Impact of Deficiencies: Judge Wilken allowed a signif-
icant number of ineffective assistance of counsel errors to
occur. The Court has previously recognized "that prejudice may
result from the cumulative impact of multiple deficiencies."
Cooper n Fitzharris 586 F2d 1325. The multiple deficiencies
in defense councel's performance resulted in cumulative
prejudice to the defense. This declaration analyzes the
individual prejudicial effect of each deficiency. USCA
Constitution Amendment Six.

The deficiencies are serious errors. Defendant does not
hesitate to conclude that there is a reasonable probability
that , absent the deficiencies, the outcome of her trial might
well have been different. Strickland v Washington 466 US 695
1984. Indeed, the plethora and gravity of the trial attorney's

deficiencies should render the proceedings fundamentally unfair.
Irresponsibility to Judicial Duties: Judge Wilken failed to
comply toher judicial duties. She refused to acknowledge that
two of the signatures on the bankruptcy petition were not
authentic, but forgeries. The petition was improperly filled
out (example: name - none; address - none, etc.) and the main
page disappeared from the exhibit file altogether. There was
no inquiry as to why the attorney did not file the petition
for 5 months, without the defendant's knowledge. Trial attorney
simply refused to put the bankruptcy attorney on the stand even
with defendant's insistence. He was present outside the courtroom
because the government had subpoenaed him. It can be noted in
the transcript that the prosecutor approached the bench with
theory that either he did something illegal or instructed the
the defendant to break the law. There was an apparent conflict
of loyalty on the part of the trial counsel. Counsel also refused
to allow the defendant to take the stand on her own behalf.
Defendant was well educated, well spoken, conducted numerous
workshops which included motivational speaking. Once again her
conflict of interest was apparent.
Joinder of Cases: [ER 355] As stated in the transcripts (ER
19, 11/10/05) the trial attorney is speaking to Judge Wilken
during final pre-trial hearing, about the government's refusal
to sever bankruptcy and taxes, the judge: "Most of our concern
has been the prejudicial tax stuff couldn't be related back
to the bankruptcy. They've responded that the house sale, they
believe, can relate to the bankruptcy, but that still leaves
open four years of conduct to the tax case, which shouldn't
relate to the bankruptcy case." "The two cases have nothing
to do with each other," said Judge Wilken. This was after
refusing to not join the cases and then to sever them once she
joined them.

    The tax case, added to the bankruptcy case less than one
week prior to the originally scheduled date of the trial. This
was apparently intended to strengthen the feeble bankruptcy
case. It was intended that the jury use the evidence of one
crime to infer a criminal disposition as defendant had no prior

criminal history, or the jury may accumulate evidence of various
crimes charged and find guilty, when if considered separately, it would not
find so; prejudice may reside in latent feelings of hostility
engendered by the charging of several crimes as distinct from
only one. It has already been proven that non-payment of taxes
triggers hostility in the minds of the average tax paying juror
All of the above are violations of <u>Fed Rules Crim Pro 8(a)</u>,
<u>14, 18 USCA</u>.

<u>Expert and Character Witnesses</u>: According to Counsel Silbert,
Judge Wilken denied defendant expert and character witnesses
due to lack of funds. The government had over half a dozen
witnesses against the defendant and had planned for several
more. The presentation of character witnesses should be standard
practice fo  a trial attorney. <u>Dillon v Duckworth 751, F.2d,
895</u>. Anticipating the malevolent testimony of the government's
star witness against defendant, there should have been witnesses
to counter this testimony. Since counsel professed ignorance
to bankruptcy and tax law expert attorneys should have available
for defendant. Citing no available funds is against the law,
as the Judge should have known. <u>White v Godinez 143, F.3d 1049;
Berryman v Morton 100 F.3d 1089; Porcaro v US 784 F 2d 38</u>.

<u>Tape Recording - Plain Error</u>: Judge Wilken allowed misogynistic
government star witness De la Cruz, whose testimony was limited
by Motion of Limine, to his payments to the defendant. [<u>See
criminal dockett #36</u>], to identify Appellant's voice on a
"defective" tape recording from her bankruptcy proceeding.
De la Cruz was not present, nor is he a voice expert, and he
was the government's star witness.

     Judge Wilken failed in her gatekeeping obligation under
<u>Federal Rules of Evidence</u> - to insure that expert witness
testimony rests on reliable foundation and is relevant to take
at hand - held to apply to all expert testimony, not only
scientific. <u>Kumbotive Co. v Carmichael 526, US 143 L. Ed.
2d 238 1999</u>.

<u>FBI and IRS Agents in the Courtroom</u>: Judge Wilken refused a
request to limit the number of Federal Agents allowed in the
courtroom during the trial. It is not beyond a reasonable doubt

refusal was received after it was mailed. It is impossible to to properly argue 18 plus grounds in the 30 pages she alloted to me. More grounds were identified during research. There was no legal reason for this limitation, no citations noted. This is just another instance of bias on the Judge's part.

Miscellaneous Issues: To complete this abbreviated document of my case, I would like to add other issues that were out-standing. From this brief, is is certainly apparent the number of issues of ineffective assistance of counsel present and the repeated Constitutional amendments violated. The following contentions are detailed in my §2255 motion.

Direct Appeal: Appeal counsel Karen Landau identified only 3 minor issues with the proceedings of my case. She refused to allow me to read the document prior to submitting it. Landau directly told me that I was no able to mention discrimination or bias and that the detention hearing could not be raised on appeal.

Counsel Believed the Defendant was guilty: Not only did she express this out right, she threatened defendant to take a plea or she would receive 15 years and no camp. Then when a plea was offered right before trial she did not inform the defendant and answered for her. [see attached exhibits].

Counsel Silbert shared confidential information of defendant with prosecutor. And absolutely refused to put tax attorney on the stand. Silbert also claimed that Judge Wilken would not agree to a Motion for Continuence of trial eventhough defendant had survived Hurricane Katrina just two months prior to trial. Unable to escape in time, defendant remained in New Orleans for a week and then took nearly another week to find safety in Atlanta. Defendant offered a note from a psychologist that her PTSD had been triggered, but Silbert insisted she would be denied the stay by the judge.

Brief Consultation with Attorney Blank was an issue: He was brought in to assist Silbert, but maintained a full case load in San Francisco. Eventhough he cross examined the government's star witness, he was unfamiliar with the case details. He spent

no more than 30-40 minutes with defendant.

Appellant is implicating a number of individuals from the 9th District Court in her issue with her case. She heartily believes that she will continue to be blocked in her efforts to find justice. In the meantime she had been incarcerated in Danbury Federal Prison Camp since January 11, 2008. Please consider this document and help find justice for her.

Respectfully submitted,

Sharon Lee Caulder
#28836-034
Danbury Federal Prison Camp
331/2 Pembroke Station Rd
Danbury, Ct06811

As I sit here vulnerable, like a rat in a cage while you periodically poke judicial prods into my heart, as earnestly as you may try, you will never pierce my soul.

cc: Michael B. Mukasay, US Attorney General
Alex Kozinski Esq. Chief Judge US Court of Appeals for 9th cir.
Judge M. Margaret McKeown, Chair Nat. Codes of Conduct Committee

August 22, 2008.

United States of America
                   v
Sharon Lee Caulder

No. 08-10339
D.C. No. 4:04-cr-40016-CW
Northern District of California
Ninth District - Oakland

"The behavior and bearing of a judge during a jury trial must
be such that the entire trial will be conducted in a general
atmosphere of impartiality."
<u>U.S. v Cassiagnil 421 F.2d 868 4th Cir 1970</u>

Dear
        I am writing to you about the blatant injustice and
religious animus that I have suffered in the Ninth District
Court in Northern California. Religious animus is intricately,
but not subtly, woven throughout the fabric of my Bankruptcy
and Tax proceedings. Scurriously, the strategy of the proceedings
was to impeach my credibility through my ancestral religion
Vodun (Voodoo).

        The trial judge inexplicably departed from established
policies, and rested on an impermissible basis such as invidious bias
against my religion. The judge's actions were so agregious and
so outrageous that it may fairly be said to shock the con-
temporary conscience.

        The government and the FBI in relentless pursuit of spirit-
ual practitioners, trumped up false charges of bankruptcy fraud
and because the contrived case was so feeble, joined a tax mis-
demeanor case at the very last minute. It was less than a week
before the first scheduled trial. During pre-trial hearing the
judge stated twice that,"the two cases have nothing to do with
each other."

        The unequivocal purpose of the government's star witness'
hours of testimony was to discredit me through descriptive
allegations of my alleged malevolent behavior, scripted from
a low-grade Voodoo film: mental torture, poisoned food and water
as I stirred the cauldron over an explosive fire hundreds of
miles away. The only missing prop was the infamous voodoo doll.

        One of the most despicable and biased acts was violating
her own Motion of Limine andcommitting reversible plain error

by allowing the government's star witness to testify as an im-
partial voice expert witness and identify my voice on an
verified poor quality audio tape from my bankruptcy hearing,
for the jury. Equally bizarre situations comprise my proceedings.

I have been an upstanding citizen for 64 years, with ex-
tensive education and training (Sharon Caulder PhD, PT, EdM,
MS, MA, Psych Certif.), and was found guilty by a jury and sub-
sequently lost my direct appeal.

I was refused bail on three occasions even though I met
all recommended criteria of the law. During the Detention
Hearings, I was denied bail because I was a "self-proclaimed"
Voodoo priestess, along with a series of allegations that were
quickly proven false.

After I was incarcerated, I filed a motion to vacate, set
aside, or correct a motion pursuant to a §2255. It was accepted
with 18 grounds in violation of my Constitutional rights, in-
cluding my First Amendment right to freedom of religion. I sub-
mitted a timely brief. By the time I was refused permission
to submit the 100 pages required to effectively argue 18+ sub-
stantial grounds, the brief was already mailed. Judge Wilken
returned the brief and requested 30 pages. Faced with another
act of personal bias, I requested that she recuse herself
from ruling on my §2255. She denied my request for recusal.
In her denial, she reiterated my example of her bias; there was
no denial of my accusations of religious animus. According to
the law, I was able to send a motion to the Court of Appeals,
but a few weeks later they requested that I show that they have
the authority to recuse a District Judge. I believe that this
is a ploy to protect the Ninth District officials. I answered
the motion and then added the attached addendum which outlines
my entire case.

Because there are a number of officials that I am accusing
of complicity: Trial Judge Claudia Wilken, Magistrate Judge
Brazil, Public Defenders Rebecca Silbert, Dan Blank, John Paul
Reitmuth, and Appellate Counsel Karen Landau, I fear that my
case will be sabotaged by denial, and never leave the Ninth
District Court.

vestigate this profound instance of injustice perpetrated against me.

Respectfully submitted,

*Sharon Caulder*

Sharon Lee Caulder
#28836-034

Danbury Federal Prison Camp
331/2 Pembroke Station Rd
Danbury, CT 06811


cc: Honorable Michael B. Mukasey, USDA
    Honorable Alex Kozinski, Chief Jugde US Court of Appeals
    Honorable M. Margaret McKeown, Ninth Circuit Judge
                Chair National Codes of Conduct Committee

EXHIBITS FOR § 2241

SHARON LEE CAULDER
V
DONNA ZICKEFOOSE, WARDEN

*Response to
Informal
remedy*

BP-S148.055
CDFRM

**INMATE REQUEST TO STAFF**
**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU PRISONS**

TO: (NAME AND TITLE OF STAFF MEMBER)         DATE: ___October 8, 2008___

*Ms ChapA , Camp ADMIN*

FROM: Sharon Caulder                  REGISTRATION NO: 28836034

_____Education_____                              Camp

WORK ASSIGNMENT:                        UNIT:

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on the back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.)

Half-way house request - I am requesting to spend the remainder

of my sentence in a half-way house. Regulations promulgated

by the Bureau of Prisons that restrict transfers to half-way

houses to the end of a prisoner's sentence, 28 CFR §§570.20

and 570.21, conflict with statutory standards and are, therefore,

invalid, the US Court of Appeals for the Ninth Circuit ruled

Spet.4, 2008. The Ninth Circuit's holding represents the majority

view. (Rodriguez v Smith 9th Cir. No.07-16014, 9/4/08. The court

stressed that Section 3621(b) says that the "Bureau may at any

time transfer the prisoner, and Section 3624(c) simply deals

with the last 10 percent of the sentence and "does not interfere

with the BOP's discretionary authority to consider such placement

DISPOSITION:

*We do not have the authority to convert
or adjust your sentence*

*10-9-08*

Signature of staff Member                    Date

Record copy - File; Copy - Inmate

*Response to Cop-out Remedy*

Caulder, Sharon
Reg. No.: 28836-034
RESPONSE TO COP-OUT

This is in response to your cop-out in which you are requesting immediate release to the halfway house to complete the remainder of your sentence.

The Bureau of Prison, does not have the authority to convert your sentence.

Mrs. Wattree, Case Manager          10/20/01

ARIZONA STATUTES     CAULDER

o Judicial set-aside - Arizona law also permits all state offenders except those convicted of serious violent offenses, to have their convictions "set aside" or "vacated" by the sentencing court, and the charges against them dismissed, upon successful completion of probation or sentence and discharge. Ariz. Rev. Stat. Ann. §§ 13-907(A). Convicted persons are entitled to be informed of their "right" to a set-aside at the time of discharge. *Id. See also* Ariz. R. Crim. P. 29.1, *supra*, requiring notice to probationers at time of discharge of right to have conviction "vacated." This relief restores all **rights** and generally releases the person "from all penalties and disabilities resulting from the conviction." However, it does not eliminate the conviction, and thus does not relieve the offender from having to report the conviction if asked. *Id. See also Russell v. Royal Maccabees Life Ins. Co.*, 974 P.2d 443, 449 (Ariz. Ct. App. 1999)(must report conviction in application for insurance even if set aside). The fact that a conviction is set aside or vacated does not release the person from certain motor vehicle restrictions, if applicable, and the conviction may still be used as a predicate offense in any subsequent prosecution. § 13-907(A). Set-aside unavailable to anyone convicted of a criminal offense involving the infliction of serious physical injury, the use of a deadly weapon or dangerous instrument, a victim less than 15 years old, or a violation of the state's laws defining sexual offenses. § 13-907(B). Set-aside does not relieve duty to register as sex-offender, *see* Ariz, Rev. Stat. § 13-3821, and does not remove firearms disability for purposes of federal firearms prosecution. *See U. S. v. Herrell*, 588 F.2d 711 (9th Cir.), *cert. denied* 440 U.S. 964 (1978).

C.

Administrative certificate: N/A

**III. Nondiscrimination in occupational licensing and employment:** ☀
A person may not be disqualified from public employment "solely because of a prior conviction for a felony or misdemeanor," nor may a person who has had his civil **rights** **restored** be disqualified from an occupation for which a license is required "solely because of" a conviction. Ariz. Rev. Stat. Ann. § 13-904(E). A person may be disqualified from public employment or denied a license by reason of conviction only if "the offense has a reasonable relationship to the functions of the employment or occupation for which the license, permit or certificate is sought." *Id.* Subsection (E) does not apply to positions in law enforcement. § 13-904(F). Any complaints concerning a violation of this subsection shall be adjudicated in accordance with the **Arizona** administrative procedures act, including judicial review. § 13-904(G). *See also* "Rehabilitating the Ex-felon: Impact of **Arizona**'s pardons and civil **rights** restoration statutes," Law & Soc. Ord., 1971, p. 793. No provisions governing private employment.

Case 3:08-cv-01409-VLB   Document 7   Filed 12/08/09   Page 36 of 52

*FedeRAL Rules Prohibiting
DiscRimmination Against Felons*

## Standard 23–8.7. Property and financial rights

(a) Persons convicted of any offense should not be deprived of the right to acquire, inherit, sell, or otherwise dispose of real or personal property consistent with the rule that a person should not profit from his or her own wrong. Persons unable to manage or preserve their property by reason of confinement should be entitled to appoint someone of their own choosing to act on their behalf.

(b) Persons convicted of any offense or confined as a result of a conviction should not, for that reason alone, lose any otherwise vested pension rights or become ineligible to participate in any governmental program providing relief, medical care, and old age pensions.

(c) State departments of insurance should require companies to offer insurance of all kinds to persons who have been convicted of any offense and should ensure that any rate differential based solely on a conviction is justified.

(d) Agencies that compile and report information used to determine a person's suitability for credit or employment should be prohibited from disclosing criminal convictions that from the date of parole or release antedate the report by more than [five] years.

## Standard 23–8.8. Employment and licensing

(a) Barriers to employment of convicted persons based solely on a past conviction should be prohibited unless the offense committed bears a substantial relationship to the functions and responsibilities of the employment. Among the factors that should be considered in evaluating the relationship between the offense and the employment are the following:

(i) the likelihood the employment will enhance the opportunity for commission of similar offenses;

(ii) the time elapsed since conviction;

(iii) the person's conduct subsequent to conviction; and

(iv) the circumstances of the offense and of the person that led to the crime and the likelihood that such circumstances will recur.

(b) Each jurisdiction should enact legislation protecting persons convicted of criminal offenses from unreasonable barriers in private employment. Such legislation should govern:

(i) denying employment;

(ii) discharging persons from employment;

(iii) denying fair employment conditions, remuneration, or promotion;

(iv) denying membership in a labor union or other organization affecting employability; and

(v) denying or revoking a license necessary to engage in any occupation, profession, or employment.

Jurisdictions should adopt appropriate mechanisms for the enforcement of prohibitions against barriers to private employment applicable to convicted persons.

(c) Past convictions should not bar a person from running for elected office, although jurisdictions may provide that conviction of specified offenses will result in the automatic forfeiture of elective office held at the time of conviction. A conviction should not bar a person from holding appointive public office, although the appointing entity may require forfeiture of an office held at the time of conviction.

(d) Public employment should be governed by the same standards proposed for private employment.

(e) For purposes of this standard, "appointive public office" includes policy-making positions. "Public employment" includes positions that generally are governed by civil service or personnel systems, or are considered career appointments.

(f) Licensing or other governmental regulations should not automatically exclude persons convicted of any offense from participation in regulated activities. Persons should not be barred from regulated activity on the basis of a conviction unless the offense committed bears a substantial relationship to participation in the activity. In determinations of whether such a relationship exists, the factors listed in paragraph (a) should be considered.

See also Uniform Law Commissioners' Model Sentencing and Corrections Act, § 4–1005 (1978) (employment discrimination against convicted offenders is unlawful unless "the underlying offense directly relates to the particular occupation, profession, or educational endeavor involved"); Wis.Stat. §§ 111.321, 111.335 (generally barring employment discrimination because of prior arrests or convictions).

In addition to statutory restrictions, the Constitution may sometimes constrain governments from denying government employment to individuals simply because of their criminal records. Supreme Court decisions have generally observed that due process requires at least a "rational connection" between the type of job for which the applicant applied and the criterion which led to the applicant's rejection. See, e.g., Schware v. Board of Bar Examiners, 353 U.S. 232, 239, 77 S.Ct. 752, 756 (1957). This rational-relationship test simply may not be met in certain circumstances when an applicant's criminal conviction serves as the basis for denial of a job.

### Questions for Discussion

1. Professor Nora Demleitner has charged that the collateral consequences of a criminal conviction often serve no penological purpose and

I Wanna New Career And I'm an Ex-Offender

the employer's bonding company will not insure. The government provides bonding coverage at no cost to the employer or the applicant. The only standards for qualification are that the applicant be qualified for the job position, not be commercially bondable, and have a firm offer for full time work. Application is made through any one of the 1,700 local offices of the state employment service (or Job Service). All ex-offenders are automatically eligible.

Between 1966 and Oct. 1990, 25,000 persons who otherwise would not have received bonding did; during this period there was a default rate of only 1.57%. Research shows that those who received bonding assistance could not have obtained the job without this coverage.

## Public and Private Agencies That Help

There are, however, public and private agencies that work to help ex-offenders find another way of life and remain out of prison. Some agencies are funded by state or local governments. Others are supported by charities, religious, and business groups. The organizations listed on page 990 offer after care services such as education/training programs, social services, and job development assistance.

According to our research, Kentucky, Nebraska, Oklahoma, Oregon, and Wyoming offer no after care programs specifically geared toward ex-offenders. These states do have charitable organizations such as the YMCA and YWCA, Goodwill Industries, Salvation Army, and United Way's First Call for Help Program. They can be found in the white business pages of the phone book. These organizations are always good places to contact and may provide other referrals that are useful.

Although most of the organizations listed do not provide legal services, a few like the National Legal Aid and Defender Association (NLADA), listed under National Organizations, provides assistance to legal aid and public defender offices. Although it doesn't provide direct services to individual clients, it does act as a referral service, providing the names of local programs that can provide inmates or ex-offenders with representation.

There are also several national advocacy groups that work to achieve reforms in the criminal justice system. Organizations such as the American Civil Liberties Union, American Friends Service Committee and CURE (Citizens United for the Rehabilitation of Errants) have state programs that offer information on education, policy development, and advocacy organization tactics. Check the white business pages of your phone book for local listings or contact the national office listed on page 990 under National Organizations.

## Employment Rights For Ex-Offenders

Ex-offenders may encounter certain discrimination in their efforts to change their lives. Here are some laws and sources that can help overcome these obstacles.

### * Misuse of Information

U.S. Department of Justice
Civil Rights Employment Litigation
601 O St., NW
Washington, DC 20004                                    202-514-5831

American Civil Liberties Union (ACLU)
125 Broad St
New York, NY 10004-2400                                 212-549-2500
www.aclu.org/

According to state and federal laws, a potential employer can ask about an ex-offender's arrest or conviction only if it is related to job duties. Federal and state laws largely limit a potential employer inquiring about arrests and convictions or using any information about arrests or convictions in making employment decisions. Without such laws, an employer's use of these records could have a discriminatory impact on minority groups.

For example, someone convicted of tax fraud who applies for a bank teller's position could be denied employment since the required job-related duties involve the handling of money.

Arrest records and conviction records may be treated slightly differently since an arrest does not always mean that charges were filed. Even if charged, a person may have been acquitted.

---

If a company is collecting the information because it is job-related, some state laws limit the availability of an applicant's history within the company itself. Access to that information may be restricted to one focal point such as the personnel office. Such restrictions help maintain the applicant's privacy.

### * Garnishment and Credit History

American Civil Liberties Union (ACLU)
125 Broad St.
New York, NY 10004-2400                                 212-549-2500
www.aclu.org

An employer cannot inquire about credit history or financial history without substantiating that it is job-related. If you have a history of bad credit, you can receive a copy of your credit report from the credit bureau in your home town or from a national credit reporting agency. A national CRA will send you a free copy of your credit report if you have been denied credit, employment or insurance within the last 60 days. Otherwise, they may charge up to $8 for a report.

Trans Union Corporation
P.O. Box 390
Springfield, PA 19064                                   800-888-4213
www.tuc.com

Experian Information Solutions, Inc.
P.O. Box 2104
Allen, TX 75013                                         888-397-3742
www.experian.com

Equifax Credit Info
P.O. Box 740241
Atlanta, GA 30374                                       800-685-1111
www.equifax.com

Once you have received a copy of your report, check it for errors. You can challenge the mistakes by explaining the error in writing to the credit reporting agency. Valid debts can be postponed or cleared by writing to the creditor and explaining your circumstances. Many creditors will accept payments as long as they are sent on a regular basis. Credit agencies don't keep criminal records or release that information.

Another way to improve your credit rating is to apply for a secured credit card. Some major banks are now offering this service to people with trouble credit histories.

Your first step is to mail in a cash deposit. The bank will then issue you a credit card with a charge limit equal to your deposit. In other words, if you don't pay your bill, the bank will seize your deposit to cover losses.

Requirements vary from bank to bank. Some banks accept any applicant who can come up with the cash deposit. Others will reward you by converting the card to a regular account if you make reliable payments on a regular basis. Signet Bank offers cards ranging from $300 to $5,000. If you don't have $300, they will open a savings account with any amount you can afford to send, and then issue the card when your deposit reaches $300. Be sure to ask questions to discover any hidden costs or penalties. And, remember, the reason for obtaining a credit card is to re-establish good credit, not dig yourself further into debt.

### * Employment Opportunities

In some states, the parole board can restore to ex-offenders certain legal rights. If an ex-offender has only one felony conviction and completes parole without another felony conviction, the parole board can issue a Certificate of Relief from Disability. Those with more than one felony conviction can get a Certificate of Good Conduct if they stay out of trouble for a specified time. However, this depends upon how severe the crime was. Contact your parole office for details.

Getting one of these certificates shows that an individual is serious about obtaining work. They may also make it easier to get some jobs or occupational licenses.

## Other Sources Of Help And Info For Ex-Offenders

### * Starting A Business With Government Money

Small Business Administration
Small Business Answer Desk
P.O. Box 34500
Washington, DC 20043-4500                               800-UASK-SBA
www.sba.gov                                             202-606-4000

If you are interested in going into business for yourself, you can call the U.S. Small Business Administration (SBA) Small Business Answer Desk or visit

September 29, 2008.

Honorable Janet Napolitano
Governor of Arizona

Dear Governor Napolitano:

I am a physical therapist presently incarcerated at Danbury
Federal Prison Camp in Connecticut. After surviving Hurricane
Katrina, I opted to relocate to Arizona to be with my children
and grandchildren. Poverty stricken, I spoke with Heidi H.
Paakkonen, Executive Director of the Physical Therapy Board,
explaining to her that I had a non-violent felony indictment.
She assured me that it would not prevent me from be granted
a physical therapy license. I passed the jurisprudence test
and filed my application. I borrowed money to relocate to Arizona
but was denied a license; (1) because I had a Felony, and (2)
because I had no proof of practicing PT for the past 5 years.
There are Arizona state laws barring occupational licensing
discrimination due to non-violent felony status, and according
to their rules and regulations, having an active PT license
from another state replaces requiring practice over the past
five years. When I applied for the license, I submitted proof
of an active PT license from New York. Also, their laws also
state that if the previous 5 years was a problem, I could work
under supervision for a period of time. I legally should not
have been denied a license. My assumption is that the true reason
for the denial was my race, because I had no problem from
Paakkonen until she viewed my photograph on my application.
I am a black woman. Based on this information I was granted

Caulder 2

permission from the EEOC to sue the government of the state
Arizona as a result of their investigation into this matter.
I was unable to pursue a suit at the time because I was still
recovering from Katrina, emotionally and financially. And then
I was imprisoned. I had to borrow the $290.00 for the license
and was told directly by Paakkonen that I could NOT reapply.

This violation of the law on her part has been placed on
the internet for public scrutiny. This is an open admission
that the State Board of Physical Therapy knowingly violated
state and federal laws regarding discrimination of felons.

I wrote to Senator McCain whose staff wrote to Paakkonen-
see attachment. When I spoke with her on the phone she told
me that I could re-apply at my own risk and that she would not
waive the fee. I sent her a copy of the state and federal laws
opposing discrimination against race and felons.

Prior to my incarceration, I spoke with her by phone and
she assured me that she was well aware of the law. When I called
your offices, I was advised by one of your assistants, with
a Native name, that there has always been discrimination in
Arizona government agencies.

I am due to return to society soon and would like to spend
my remaining days with my family in Arizona. I have been an
upstanding citizen all of my life, with 35 years of experience
as a physical therapist and many advanced degrees and training
including a PhD. Please grant me the license I am entitled to.

Thank you for your kind attention in this matter.



## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES
### INFORMAL RESOLUTION FORM

**NOTICE TO INMATE:** You are advised that prior to receiving and filing a Request for Administrative Remedy Form, you **MUST** attempt to informally resolve the complaint through your Correctional Counselor. Briefly state complaint below and list what efforts you have made to resolve your complaint informally. Also, please state names of staff contacted.

Date Informal Resolution Form Issued by Correctional Counselor: 10/30/08

INMATE'S NAME: SHARON CAULDER NUMBER: 288 36034 QUARTERS: Camp

1. Complaint: Request for 12 months half-way house was denied by Ms Chapa, despite FEDERAL LAW on Books. I am in compliance with the criteria AND should be able to take advantage of LAWS created to help me remain a productive individual in society.

2. Efforts made to informally resolve: Spoke with Warden who explained that she did not have to follow the law concerning CCC. That she knew better, in that 6 mos. is too much and causes problems.

Names of Staff contacted: Ms Chapa, Ms Perkins, Warden Z.

Inmate's Signature: Sharon Caulder   Inmate's Number 288 36034

## CORRECTIONAL COUNSELOR'S COMMENTS:

1. Date Returned to Correctional Counselor: 10/31/08

2. Efforts made to informally resolve: your request for 12-month halfway was reconsidered under the Second Chance Act of 2007.

3. Names of Staff contacted: It was determined that your request did not meet the criteria of extraordinary or compelling reasons.

(Ms. Mather)

Date Informally Resolved: _____ Signature: _____ (Counselor)
Or
Date Issued: 10/31/08

Distribution:  I.   If complaint is informally resolved, forward original to Warden (Attention: Program Coordinator)

II.   If complaint is NOT informally resolved, forward original attached to Administrative Remedy Form to Warden (Attention: Program Coordinator )



## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES
### INFORMAL RESOLUTION FORM

**NOTICE TO INMATE**: You are advised that prior to receiving and filing a Request for Administrative Remedy Form, you **MUST** attempt to informally resolve the complaint through your Correctional Counselor. Briefly state complaint below and list what efforts you have made to resolve your complaint informally. Also, please state names of staff contacted.

Date Informal Resolution Form Issued by Correctional Counselor: 10/30/08

INMATE'S NAME: SHARON CAULDER NUMBER: 288 36034 QUARTERS: Camp

1. Complaint: Request for 12 months half-way house was denied by Ms Chapa, despite Federal Law on Books. I am in compliance with the criteria AND should be able to take advantage of laws created to help me remain a productive individual in society.

2. Efforts made to informally resolve: Spoke with Warden who explained that she did not have to follow the Law concerning CCC. That she knew better, in that 6 mos. is too much and caused problems.

Names of Staff contacted: Ms Chapa, Ms Perkins, Warden Z.

Inmate's Signature: Sharon Caulder   Inmate's Number 288 36034

## CORRECTIONAL COUNSELOR'S COMMENTS:

1. Date Returned to Correctional Counselor: 10/31/08

2. Efforts made to informally resolve: Your request for 12-month halfway was reconsidered under the Second Chance Act of 2007.

3. Names of Staff contacted: It was determined that your request did not meet the criteria of extraordinary or compelling reasons.

(Ms. Mathee)

Date Informally Resolved: _____ Signature: _____ (Counselor)

Or

Date Issued: 10/31/08

Distribution: I.   If complaint is informally resolved, forward original to Warden (Attention: Program Coordinator)

II.   If complaint is NOT informally resolved, forward original attached to Administrative Remedy Form to Warden (Attention: Program Coordinator)

-1--

Sharon Lee Caulder #28836-034

In order to establish a self-sustaining and law abiding life, 12 month half-way house stay would be required. This would enable me to access and sufficiently utilize available transitional services back into the community.

In early 2000, I relocated to New Orleans to establish a new business. I was suddenly imprisoned for 5 weeks because bail was refused because of my religion. Otherwise, I would have been arrested and returned fairly immediately.

Because of this sustained absence at a critical period in my business development, my business took a downward turn. The arrest scarred my reputation and business continued to wane. Then in August of 2005, When I did not own an automobile due to diminished finances, I was unable to flee Hurricane Katrina. Surviving Hurricane Katrina was an intense emotional trauma, triggering PTSD from early childhood distrubances.

My business and home were essentially lost. Two months later, I was on trial for a felony and misdeamor. My trial counsel refused to submit a motion for a continuence due to the hurricane.

I lost the trial but remained out of prison, awaiting sentencing and then an appeal.

Destitute, I decided to relocate to Arizona where I have close family, children and grandchildren. As I had several years experience as a physical therapist, I decided to apply for a license in Arizona. After speaking with the executive director of the PT licensing bureau and explaining that I was a felon, she encouraged me to apply. I borrowed money to relocate to Arizona. Once I arrived and settled, I was denied the license. The denial was based on the fact that I was a felon.

My experiences with navigating the private community for jobs and the government for jobs and professional licenses as a felon takes many months and monies (for room and board) for document submittals and hearings. Also, access to unemcumbered phone and email, and internet, not available in prison, must be readily available.

Even with a copy of an Arizona statute that provides for jobs and occupational licenses for felons, I was unable to secure one. With **5 advanced** educational degrees including a Ph.D and a plethora of advanced and specialized training I was unable to secure a position.

Eventually, I secured a physical therapy license in New Mexico and borrowed money to relocate. I worked for a county facility but was fired 2 months later when my fingerprint report came in. It took me several weeks to discover that it was the Department of Health's decision to fire me. That excluded employment throughout the state's Hospital and Health facilities. New Mexico apparently does not have statutes assisting felons in employment or licensing, but is considered an "outlaw" state, meaning that the hiring or firing of felons is up to the company administrators. My superiors fought to keep me in the position but the Health Department refused.

Even when a profession is handicapped such as physical therapy with a tremendous national shortage during wartime, the resistence to hiring a felon is powerful and unrelenting. At least one year half way house time is needed to conquer this tragic discrimination. Access to advocates in community job placement bureaus is sorely needed to re-enter the community appropriately. Time is needed to force Federal and State statutes which prevent violations of rights to government jobs and securing professional licenses. Mental Health: I need time to begin my healing process and settle into the community and my family. This process is impossible in the prison environment with such intimate quarters, a multitude of emotionally unstable population, no counseling or re-entry programs available. Access to re-habilitation services are not possible. Mental Health and rehabilitation services are most effective when conducted with family involvement. It has already been proven that family involvement and contact dramatically reduces the recidivism rate (see second chance act). A more normal home environment is needed to assist with my PTSD issues.

AGE: 12 month half way house stay will enable me to seek a job prior to reaching 65 years of age. This will increase my opportunities to find a job in my profession.

RESTITUTION: My restitution of $183,000 has been paid in full.

Respectfully submitted,

*Sharon Caulder*

Sharon Lee Caulder
#28836-034
Danbury Federal Prison Camp
331/2 Pembroke Station Rd
Danbury, CT 06811

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.

| From: | Caulder, Sharon Lee | 28836-034 | Camp | Danbury |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST** I Appreciate your reconsideration of my request for 12 month halfway house residency under the Second Chance Act of 2007. But I was perturbed about your determination that my request did not meet the criteria of "extraordinary or compelling" reasons. Your pronouncement is perplexing in that the criteria listed in the Act do not mention the need for "extraordinary or compelling" reasons.

The purpose and criteria for the Act are well delineated in the document. There seems to be some confusion with the Compassionate Release Act, which requires extraordinary or compelling reasons.

The ultimate, definitive purpose of the Act is well established and lucid in its documentation. It is simply to break the cycle of recidivism, reducing the phenomenal annual recidivism rate. According to the courts the BOP is mandated to base their compelled individual consideration on same 5 criteria used upon prisoner incarceration. (18 §3621) Prisoners qualified for Camp as their initial placement usually meet the criteria. I meet the court and the BOP criteria for 12 month halfway house residency, NOT for Compassionate Release Act. 11/7/08 S. Caulder

DATE                                    SIGNATURE OF REQUESTER

**Part B– RESPONSE**

See attached

RECEIVED

NOV 1 2 2008

DATE                                    WARDEN OR REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: 515436-F1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

DATE                            RECIPIENT'S SIGNATURE (STAFF MEMBER)

USP LVN          PRINTED ON RECYCLED PAPER          BP–229(13)
                                                     APRIL 1982

The Department of Justice research concluded that 650,000 inmates are released into their communities annually and the numbers are on the rise. Research also determined statistically the predominant reasons for recidivism among the prison population. The Justice Department lawmakers formulated the Second Chance Act designed to reduce the current recidivism rate. It is obvious that granting up to 12 months half-way house residency is the core of the resolution to the problem.
The areas of issue are:
(1) Jobs - Dept of Justice research concludes that 60% of ex-offenders do not have gainful employment one year following release. Unencumbered telephone, email, and internet access plus a daily newspaper are essential and not available in prison confinement.
(2) HOUSING - It is difficult to secure adequate housing, financially and scoping out new neighborhoods.
(3) FAMILY RELATIONS - Healthy family relationships are designated as the most relevant issue in impeding an ex-offender's return to prison.
Healthy family relationships require (1) adequate, consistant counseling for ex-inmate and family which can be best accomplished in community based services, (2) A healthy family unit demands healthy individuals. Accompanying the reason for the crime is the established fact, that incarceration is responsible for deteriorated mental health. Mental health services within the prisons are known to be not only inadequate but often simply cruel by internal and external investigators. (madrid v Gomez 889 F. Supp. 1146 N.D. Ca. 1995)
(4) Special counseling for substance abuse and mental illness that has been found to be so prevalent in the prison population is best rendered in community services. This counseling is mandatory to ensure the success of healthy family relationships. Mental health and environmental deprivation, abuse, and mis-education must be tended for the children who have been reared in crime and /or deprived of mothers and fathers.
(5) Ex-offenders require time to rebuild ties within the community or explore new communities to acquire the opportunity to get a fresh start.

Added to the general mandated criteria, my personal situation reflects the core issues established by the Dept of Justice implicated in the Second Chance Act. After surviving Hurricane Katrina, I have lost everything, including home and business. Contrary to public belief, most victims have not been adequately compensated by the government through FEMA. At 64+ years old I must start over again. I have been denied professional licenses in states where there are state and federal laws prohibiting discrimination in professional licensing and employment against non-violent, non-sexual criminal acts. And once I located a state that proffered a license, I was fired by the state dept of health. My alleged crime was not related to my profession. I have a PhD along with several other advanced academic degrees and training. I would be an asset to any community. It really does require specialized community employment services to assist in job searches.

I respectfully request that once again you reconsider my request for 12 month halfway house placement.

**ADMINISTRATIVE REMEDY**
**CAULDER, Sharon**
**Register Number  28836-034**


**PART B - RESPONSE (515436-F1)**

This is in response to your administrative remedy in which you request reconsideration for a 12 month halfway house residency under the Second Chance Act of 2007.  You state you were perturbed it was determined that your request did not meet the criteria of "extraordinary or compelling reasons.  You state that after surviving Hurricane Katrina you lost everything, which included your home and business, and at the age of 64, you must start over.  You state with your Ph.D. and several other advanced academic degrees and training, you will require a specialized community employment service to assist in your job search.   Therefore, you are requesting reconsideration for a 12 month halfway house placement.

On May 31, 2006, you were sentenced in the Northern District of California to a 30-month term of incarceration, with a 3 year term of supervised release to follow for Concealment of Assets in Bankruptcy Proceedings, and Willful Failure to File Tax Return.  Your projected release date via Good Conduct Time release is February 19, 2009.

The Second Chance Act of 2007, generally speaking, alters the amount of time that the Bureau of Prisons may, in its discretion, assign inmates to Residential Reentry Centers (RRC's) for pre-release (or "end of sentence") placement under 18 U.S.C. & 3624 (C),  increasing the possible duration of such assignments from up to six months to up to twelve months.  Following passage of the Second Chance Act of 2007, the Bureau of Prisons and FPC Danbury undertook a reconsideration of all inmates "end-of-sentence" RRC placements under the new criteria established including consideration for placement of up to 12 months.  A number of factors are considered when determining the appropriate length of RRC placements for inmates, including but not limited to, the resources of the facility contemplated, the nature of circumstances of the offense, the history and characteristics of the prisoner, the statement of the court that imposed the sentence, individual needs, disciplinary records and existing community resources.

Your individual reconsideration for pre-release placement to an RRC under the increased provision of the Second Chance Act has already been reviewed.  The individual circumstances you raise were considered at that time.  On October 20, 2008, it was determined that a pre-release RRC placement of 90 - 120 days was appropriate for you and of sufficient duration to provide the greatest likelihood of successful reintegration into the community.  You are currently pending a relocation to the District of Arizona to reside with your daughter.  Therefore, you have established housing, and will be able to utilize the assistance of the halfway to secure employment.

Accordingly, your request for administrative remedy is denied.

If you are dissatisfied with this response, you may appeal to the Regional Director at the Bureau of Prisons, Northeast Regional Office, U.S. Customs House, 7th Floor, 2nd and Chestnut Streets, Philadelphia, Pennsylvania, 19106.  Your appeal must be received by the Regional Office within 20 calendar days of this response.

Donna Zickefoose, Warden

11.18.2008
Date

**U.S. Department of Justice**

Federal Bureau of Prisons

11/19/08  KB

**Regional Administrative Remedy Appeal**

---

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Caulder, Sharon Lee         28836-034         Camp      Danbury·
  LAST NAME, FIRST, MIDDLE INITIAL         REG. NO.         UNIT         INSTITUTION

**Part A - REASON FOR APPEAL** The fact that the warden and the 3 administrators of this facility have apparently not taken time to read and process the Second Chance Act of 2007, is infact, astounding and alarming. It is a challenge to comprehend the facts that: (1) This behavior stipulates a total disregard for the laws implemented by Congress;(2) administration failures to assure that the women under their care and total control have the opportunity to take advantage of any and all considerations provided to them; (3) demonstrates failure to take legal and moral responsibility for the 1500 women under their care; (4) failure to possess or express, or demonstrate a general concern for the mundane welfare and future of women that you interact with on a daily basis.
  These issues become very clear in their responses to verbal questions, and statements, individually and en banc in Team meetings, and in written responses, as above, in reference to 2nd CA.
  Please note that in the initial paragraph of this administrative remedy, I express my concern that the warden did not respond to my statement, but replied to a statement that I did not make. In her response she stated my situation and reiterated

DATE 11/24/08         Sharon Caulder         SIGNATURE OF REQUESTER

**Part B - RESPONSE**

---

DATE                                             REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                           CASE NUMBER: _____

**Part C - RECEIPT**
                                                  CASE NUMBER: _____

Return to: _____
         LAST NAME, FIRST, MIDDLE INITIAL         REG. NO.         UNIT         INSTITUTION
SUBJECT:_____

DATE                              SIGNATURE, RECIPIENT OF REGIONAL APPEAL

USP LVN                                                              BP-230(13)
                                                                     JUNE 2002

PRINTED ON RECYCLED PAPER

that they did not meet criteria of "extraordinary or compelling"
reasons. I have carefully, verbally explained to the warden, Ms
Chapa, admin, Mrs Wattree and Mrs Perkins that the Second Chance
Act does not have criteria of "extraordinary or compelling"
reasons, at least once and I have written this information at
least once. The proper request for extraordinary and compelling
reasons is "Compassionate Release" NOT the Second Chance Act of
2007." Continuing to confuse the acts, appears to be detrimental
to those of us meant to have accessibility to the attributes
afforded us in the Second Chance Act.

With this stated, reiterating my present situation in para-
graph I of the warden's response, and then deciding that the
situation is not extraordinary, reflects the essence of a fright-
enly uncaring individual, who does not exemplify the character-
istics of those expected in a leadership position in an advanced
civilization.

My situation would be considered extraordinary to most un-
biased human beings, but it obviously is not my reason for re-
questing to be granted a 12 month halfway house residency. The
creators and signers of the Second Chance Act felt strongly
that convicts like me, who have to now face a difficult society
with the extreme disadvantage of being labeled a felon, will
have more time and assistance starting a new life, and not re-
turn to prison. The essence of the Act is to be generous with it.
That is the only way it will effect the 650,000 released con-
victs. The BOP is mis-using the act. When I asked the warden,
why she refused to abide by the act that was already on the books
her reply was that, she was not aksed her opinion, which is that
in her experience 6 months halfway house is too much, as in her
experience most convicts do poorly with this much time. My
reading of the statistics is that hardcore felons have a problem
with 6+ months CCC, but I am in a female camp of non-violent,
mainly first offenders, leaving precious children behind.

I want to be independent and productive, just as I was
prior to this debacle in my life. Therefore the fact that I
have a daughter who has allowed me to give her address, because
I was told by Mrs. Wattree taht I needed one, does not mean that
I should not be eligible for the Second Chance Act.

I have had experience with acceptance in the community
as a felon, as I awaited my appeal. It took many months, and
weeks on the phone to locate employment, and even then once
my fingerprints returned, I was fired. Even as a professional
and in states where statutes against discrimination against
felons is prohibited, I was fired. And the economy was not
quite as forlorn as it is now.

Family relations are stressed and strained. I believe that
often the family suffers more than the felon. Community ass-
istance is needed. It has been downright scary for my young black
grandchildren to witness their straight and honest grandmother
incarcerated. Then they had no chance!

Once again I am requesting to be granted the 12 month CCC
available to me through the Second Chance Act created and pass-
ed by my government to assist me in this most challenging time
in my life. I ahve been a model prisoner and teach GED science
and Social Studies and feel privileged to have spent this time
in service to others, as I have been all of my life.

Thank you for your kind consideration.

<

## WRIT OF HABEAS CORPUS
## PURSUANT TO 28 USC § 2241
## BY A PERSON IN FEDERAL CUSTODY


Sharon Lee Caulder, #28836034
        petitioner

                v                                        Case #_____

Donna Zickefoose, Warden
        respondent


## CERTIFICATE OF SERVICE

I, Sharon Caulder, pro se, mailed the enclosed document by
US Postal certified mail on December 3, 2008, by placing it
in the mail receptacle located in the prison. The document
was mailed to:

Office of the clerk
US District Court
915 Lafayette Blvd
Bridgeport, CT 06604


Respectfully,

Sharon Lee Caulder

#28836-034

Danbury Fed Prison Camp
331/2 Pembroke Station Rd
Danbury, CT 06811